United States District Court
For the Northern District of California

1
2
3
4
5
6
7           IN THE UNITED STATES DISTRICT COURT
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   OTIS THOMAS,                    )   No. C 06-3581 MMC (PR)
                                     )
11               Plaintiff,          )   **ORDER GRANTING  DEFENDANTS'**
                                     )   **MOTIONS FOR SUMMARY**
12         v.                        )   **JUDGMENT; DENYING PLAINTIFF'S**
                                     )   **MOTIONS FOR JUDICIAL NOTICE**
13   M.S. EVANS, Warden, et al.,     )
                                     )
14               Defendants.         )   **(Docket Nos. 22, 43, 55 & 56)**
     _____ )
15
16         On June 5, 2006, plaintiff, a California prisoner currently incarcerated at Centinela

17   State Prison and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C.

18   § 1983, alleging the violation of his constitutional rights by prison officials at Salinas Valley

19   State Prison ("SVSP").  On July 5, 2006, plaintiff filed an Amended Complaint ("AC"),

20   which is the operative pleading herein.  In response to the AC, defendants have filed two

21   dispositive motions: (1) on April 11, 2007, defendants filed a motion for summary judgment

22   on plaintiff's First Amendment and Equal Protection claims ("Motion for Summary

23   Judgment I"), and (2) on August 7, 2008, defendants filed a motion for summary judgment

24   on plaintiff's Eighth Amendment claim ("Motion for Summary Judgment II").  Plaintiff has

25   filed opposition to each of  defendants' motions,[1] and defendants have filed a reply.

26   _____

27         [1]As noted by defendants in their reply, the opposition filed by plaintiff on December
     17, 2008, in response to defendants' Motion for Summary Judgment II, encompasses all of
28   the arguments presented by plaintiff in his earlier opposition, filed February 13, 2008, to

**United States District Court**
**For the Northern District of California**

# FACTUAL BACKGROUND[2]

The events underlying plaintiff's claims occurred in 2005-2006 in Facility C, a level IV maximum security housing unit at SVSP.  At all relevant times herein, plaintiff was a level IV prisoner housed in Facility C, defendant G. Ponder ("Ponder") was the captain of Facility C, defendant M. Kircher ("Kircher") was a correctional officer in Facility C, and defendant M.S. Evans ("Evans") was the warden at SVSP.  (AC at 2.)

A.     Modified Program For Facility C Inmates

Inmates are housed in Facility C for various reasons, including a history of assaultive behavior and disciplinary actions, gang-related convictions, and lengthy or life sentences. (Decl. Def. Ponder Supp. Defs.' Mot. Summ. J. I ("Ponder Decl.") ¶ 4.)  On July 14, 2005, in Facility C, an inmate using a homemade knife stabbed and almost killed two correctional officers.  (Id. ¶ 18; Decl. Lt. Celaya Supp. Defs.' Mot. Summ. J. II ("Celaya Decl.") ¶ 3.)  As a result of the incident, SVSP was placed on lockdown.  (Ponder Decl. ¶ 15; Celaya Decl. ¶ 3.)  Eventually, the lockdown was lifted for all housing units with the exception of Facility C which, before the incident, had been in the process of returning to a normal program after a previous violent incident.  (Ponder Decl. ¶¶ 14-15.)  Facility C remained on lockdown until September 9, 2005, when it transitioned from lockdown to a "modified program."  (Id. ¶ 15.)

During a modified program, Facility C inmates are affected as follows: they are restricted to and fed in their cells; certain privileges or activities such as quarterly packages, visitations, and outdoor recreation are restricted, curtailed or modified; and the movement of all inmates is in restraints and under escort.  (Id. ¶ 6.)  During the relevant period herein, the modified program allowed non-contact visits only, suspended quarterly packages, and curtailed outdoor recreation.  (Id.)

---

defendants' Motion for Summary Judgment I.  (Reply at 2:1-9.)  Consequently, defendants, in their reply, refer only to the December 17, 2008 opposition.  As that opposition comprehensively addresses the arguments made by defendants in both of their motions for summary judgment, the Court likewise will rely on the December 17, 2008 opposition in ruling on defendants' motions.

[2]Unless otherwise noted, the facts set forth in the following section are undisputed.

United States District Court
For the Northern District of California

1   The primary objective of a prison lockdown and modified program is to provide a

2   secure and safe environment for both staff and other inmates.  After the disturbance or

3   emergency that led to the lockdown and modified program is isolated and contained, an

4   investigation is conducted to collect evidence and gather information.  The investigation may

5   involve: inmate interviews; searches of cells, common areas, yards, and buildings;

6   monitoring of incoming and outgoing mail; and other means of collecting information.  At

7   the conclusion of the investigation phase, the facility captain is responsible for formulating a

8   plan to return the affected facility to a normal program.  (Id. ¶ 17.)

9   B.   Plan to Return Facility C to Normal Program

10   At the conclusion of the investigation phase following the July 14, 2005 stabbing

11   incident, defendant Ponder, the captain of Facility C, formulated and implemented a plan to

12   return Facility C inmates from a modified program to a normal program.  (Id ¶¶ 7 & 16.)  On

13   October 17, 2005, Ponder sent a memorandum to Facility C inmates, updating them on the

14   program status of Facility C and explaining what they would be required to do to be returned

15   to a normal program.  The memorandum explained that the following steps were being taken

16   in response to a recent history of ongoing violence in Facility C:

17   Prior to the attempted murder of the two Correctional Officers, the facility was
18   operating under four separate modified programs.  Over the last few years C
    Facility has operated on continuing modification due to the violence within the
19   facility.  The motives of each disturbance have varied, however the singular
    driving force behind each incident has been level IV inmate's [sic] politics
    which are predominately gang related.  The inmate population succumbs to this
20   peer pressure and condones this violence as acceptable in a level IV 180
    general population setting.  The attitude and violence has continued over a
21   substantial period of time.  During meetings with various inmates on the
    facility during classification and tours of the units, inmates repeatedly have
22   confirmed this verbally as well as by their actions to staff.  This is
    unacceptable.  This jeopardizes the safety and welfare of every person who
23   lives and works on the facility.

24   Although incarcerated, each inmate is expected to be a law abiding citizen, the
    choice to program and rehabilitate oneself falls directly on each individual
25   inmate.

26   I am developing a process to help the facility work towards providing inmates
    that want to program without violence an opportunity to do so.  The choice to
27   program will be in the hands of each individual inmate.  The first step in this
    process will be interviews.  The next step will be your commitment to program
28   without violence and verification of this commitment by signing that fact.  The

3

United States District Court
For the Northern District of California

1
2

next process will involve Correctional Officers identifying inmates that have shown willingness to program and providing a list of those inmates to supervisory staff.

3
4
5

Inmates that fail to act in accordance with Departmental rules and Institution procedures will result in housing and program changes.  Inmates are advised that their privileges and access to programs will be curtailed until you as an individual successfully comply with this process.

6
7

In closing, your program is in your own hands.  Program is available to any and all general population inmates.  All you need is the willingness and commitment to program without violence.

8

(Decl. Csl. (Neah Huynh) Supp. Defs.' Mot. Summ. Jud. II ("Huynh Decl.") Ex. 2 Part 1

9

(Def. Ponder's Resp. Pl.'s Req. Produc. Docs.) RPD 0003.)

10

Ponder's plan included interviewing each inmate at least two times in order to gather

11

intelligence and identify those inmates who were willing to program without violence.

12

(Ponder Decl. ¶ 16; Celaya Decl. ¶ 4.)  At each interview, the inmate would be asked to sign

13

a CDC-128-B "pledge"[3] as evidence of his willingness to follow the program without

14

violence.  (Id.)  The CDC-128-B pledge stated:

15
16

I am currently housed within Facility 'C' Salinas Valley State Prison.  I am also aware that this facility is on modified program status based upon several acts of violence having occurred within the past 15 months.

17
18

By signing this document, I am advising staff that I want to participate in the program review process being implemented at this time.  I am also stipulating that I want to "do my own time" and will program by not participating in gang violence.

19
20
21

I have been advised that my failure to act in accordance with institutional rules and procedures may result in program and housing changes.  I am aware that during the time I participate in the program review process, I will retain my established work/privilege group.

22
23
24

I am aware, if I am unassigned and I participate in the program review process that my participation does not constitute a credit earning assignment.  Further, I understand that my privileges and access to programs will be curtailed until I successfully complete this program and am returned to normal general population program status.

25

I have been advised that the program review process is ongoing and that I will

26
27
28

[3]"CDC-128-B" is the form number used by the California Department of Corrections and Rehabilitation ("CDCR") to identify departmental memoranda, but not the contents thereof.  Consequently, for the purpose of clarity, the Court refers to the CDC-128-B attached as Exhibit 1 to defendant Ponder's declaration, and constitutes the basis for much of the dispute herein, as the "CDC-128-B pledge."

be expected to maintain compliance with regulations to participate.  During the program review process I will be required to interact with other inmates of all races and ethnicity during all out of cell activities.  The process and my participation in it, is on-going and monitered. [sic]  During this period I understand that my progress and suitability to remain in the program will be monitored and evaluated by staff.

(Ponder Decl. Ex. 1.)

The inmates who were found willing to program without violence typically were returned immediately to normal programming following the initial interview or signing of the CDC-128-B pledge.  (Ponder Decl. ¶ 8; Celaya Decl. ¶ 4.)  Inmates who did not "meaningfully" participate in the interview process, such as those inmates who refused to sign the CDC-128-B pledge or declined interviews, were identified either as failing to successfully complete the interview process or interviewing in such a fashion that staff could not determine the threat posed by those inmates to other inmates or staff.  (Celaya Decl. ¶ 5.)  Such inmates were retained on modified program status, (Ponder Decl. ¶ 9), and received closer scrutiny and further assessment of their risk and threat to prison staff and other inmates, including close review of their central files for gang and disciplinary histories.  (Celaya Decl. ¶ 5.)  Each inmate who refused to sign the CDC-128-B pledge would continue to be interviewed either until all inmates in the affected facility signed the pledge or until the facility captain deemed it safe to return the facility to a normal program based on intelligence received during the investigation.  (Ponder Decl. ¶ 10.)

C.     Plaintiff's Refusal To Sign the CDC-128-B Pledge

Following defendant Ponder's implementation of the above plan to return Facility C to a normal program, plaintiff was interviewed several times between August 2005 and June 2006.  (See Huynh Decl. Ex. 1 Part 1 (Pl.s' Depo.) at 141:25, 142:1-4, 147:4-8, 148:21-24, 152:6-9, 195:9-14.)  Plaintiff does not remember if he was asked to sign the CDC-128-B pledge at each of the interviews, but states that at each interview he either refused to sign the pledge or, if prison officials had asked him to sign the pledge, he would have refused.  (See id. & Pl.'s Depo. at 151:11-14, 152:2-5.)

In particular, the record shows that during plaintiff's November 2, 2005 interview he

1  was asked to sign the CDC-128-B pledge but refused to do so.  (Ponder Decl. ¶ 17.)

2  Subsequently, on November 4, 2005, Ponder sent a memorandum to plaintiff, informing him

3  that he had failed to complete the interview process or had interviewed in such a manner that

4  prison staff could not determine the level of threat he posed to staff or inmates.  (Id. ¶ 18 &

5  Ex. 3.)  As a result, plaintiff was informed:

> [Y]ou will remain on modified program status to include **personal hygiene**
> **canteen draw only, no quarterly packages, no special purchase**.  Also due
> to your refusal/failure to comply with the interview process and administrations
> [sic] inability to ascertain your threat status you will be placed on **non-contact**
> **visiting**.  These modifications will remain in effect until further notice.

9  (Ponder Decl. Ex. 3.)  Further, plaintiff was informed he would be placed at the bottom of the

10  interview list to be reviewed for program potential.  (Id.)

11      Prison officials deemed plaintiff an unknown risk and threat to prison staff and other

12  inmates not only because he refused to sign the CDC-128-B pledge, but also because he had

13  a history of disciplinary problems and was suspected of gang involvement.  (Celaya Decl. ¶

14  5, Huynh Decl. Ex. 2 Part 1 (Def. Ponder's Resp. Pl.'s Req. Produc. Docs.) RPD 0004.)

15      Plaintiff remained on modified program status until August 31, 2006, when he signed

16  the CDC-128-B pledge and was returned to a normal program.  (Ponder Decl. ¶ 18.)  As a

17  result of being on modified program status, plaintiff was denied outdoor exercise for

18  approximately thirteen months.

19  D.   Plaintiff's Claims

20      Based on the above, plaintiff asserts the following claims for relief: (1) defendants

21  violated his First Amendment rights by requiring him to sign the CDC-128-B pledge in order

22  to be returned to a normal program, (2) defendants violated plaintiff's right to equal

23  protection by denying him access to privileges afforded other inmates who also had refused

24  to sign the CDC-128-B pledge, and (3) defendants violated plaintiff's Eighth Amendment

25  rights by depriving him of outdoor exercise for thirteen months while he was on modified

26  program status.

27

28

**DISCUSSION**

A.      <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>See</u> <u>id.</u>

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 248 (holding fact is material if it might affect outcome of suit under governing law; further holding dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>See</u> <u>Celotex</u>, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if, as to any given fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  <u>See</u> <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting

United States District Court
For the Northern District of California

1    evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec.

2    Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

3    B.    First Amendment Claim

4         Plaintiff claims that requiring him to sign the CDC-128-B pledge in order to be

5    returned to a normal program violated his First Amendment "right to political beliefs,"

6    because the pledge provides for "endless punishment" or "unspecified discipline" and asks

7    "questions about other inmates."  (AC at 2:24-27, 4:1-3, 4:26-28, 5:1-2.)  Further, plaintiff

8    maintains, his First Amendment rights were violated because he was forced to choose

9    between signing the pledge or being punished, specifically, being retained on modified

10   program status.  (Opp. at 15-16.)

11        Prisoners retain those First Amendment rights not inconsistent with their status as

12   prison inmates or with legitimate penological objectives of the corrections system.  Turner v.

13   Safley, 482 U.S. 78, 95 (1987).  Thus, when a prison regulation impinges on a prisoner's

14   First Amendment rights, the regulation nonetheless is valid, and no constitutional violation

15   occurs, if the regulation is reasonably related to legitimate penological objectives.  Id. at 89.

16        As an initial matter, defendants argue that requiring plaintiff to sign the CDC-128-B

17   pledge as a prerequisite to returning to a normal program did not unconstitutionally abridge

18   plaintiff's First Amendment right to express his political beliefs because, contrary to

19   plaintiff's assertions, the pledge does not impose "endless punishment" or "unspecified

20   discipline" on those who sign it, nor does it ask questions about other inmates.  The Court

21   agrees.  The language of the pledge requires only that the inmate document his intent to

22   program without violence and acknowledge that the program-review process is ongoing.  See

23   supra at 4:14-5:3.

24        Defendants further assert that plaintiff has not produced evidence showing he was

25   forced, in violation of his First Amendment rights, to choose between signing the pledge or

26   being punished.  In particular, defendants point out that for many months plaintiff chose not

27   to sign the pledge but was never subjected to punishment as a result.  Rather, he simply was

28   maintained on modified program status.  The Court agrees that plaintiff's assertions of

8

United States District Court
For the Northern District of California

punishment are unsupported; the undisputed evidence shows the modified program was implemented as a security measure and not as a form of punishment, and that inmates were not forced to sign the pledge merely because they were offered the incentive of returning to a normal program if they did so.

For the foregoing reasons, the Court finds plaintiff has not created a triable issue with respect to whether the pledge requirement impinged upon his First Amendment rights. Even if there was such an impingement, however, the Court further finds, as discussed below, that no constitutional violation occurred, because the pledge requirement was reasonably related to legitimate penological objectives.

     1.    <u>The Turner Test</u>

In <u>Turner v. Safley</u>, the Supreme Court identified four factors for courts to consider when determining whether a regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." <u>Turner</u>, 482 U.S. at 89-90.

The task in considering the <u>Turner</u> factors is not to balance the four factors, but to determine whether the state shows a reasonable, rather than simply logical, relationship between the policy and legitimate penological objectives. <u>Beard v. Banks</u>, 548 U.S. 521, 533 (2006). While all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities. <u>Id.</u> at 529. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage. <u>Id.</u> at 530.

**United States District Court**
For the Northern District of California

1      a.      First Turner Factor

2          With respect to the first <u>Turner</u> factor, the initial burden is on defendants to put forth a

3  "common-sense" connection between their policy and a legitimate penological interest.  <u>See</u>

4  <u>Frost v. Symington</u>, 197 F.3d 348, 357 (9th Cir. 1999).  If defendants do so, plaintiff must

5  present evidence that refutes the connection.  <u>Id.</u>  Defendants must then present enough

6  counter-evidence to show that the connection is not "so remote as to render the policy

7  arbitrary or irrational."  <u>Id.</u>

8          Here, defendants argue that their policy of requiring inmates to interview and sign the

9  CDC-128-B pledge before returning to a normal program bears a common-sense connection

10  to the legitimate penological interest of maintaining prison security.  It is undisputed that

11  prison security is a legitimate penological interest.  <u>See</u> <u>Turner</u>, 482 U.S. at 91; <u>Mauro v.</u>

12  <u>Arpaio</u>, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc), <u>cert. denied</u>, 529 U.S. 1018 (2000)

13  ("It is beyond question that both jail security and rehabilitation are legitimate penological

14  interests.").  Additionally, the Court finds, for the following reasons, that the undisputed

15  evidence produced herein shows the pledge requirement had a valid, rational connection to

16  institutional security.

17          As evidenced by the declarations of defendant Ponder and Lt. Celaya, prison officials

18  used interviews to investigate the July 14, 2005 stabbing, as well as to identify inmates

19  showing a willingness to participate in normal programming without violence.  Additionally,

20  prison officials believed that inmates who agreed to sign the pledge were signaling their

21  willingness to program positively and not engage in violence, as well as their willingness to

22  participate in the program-review process.  Inmates with unsuccessful interviews and those

23  who refused to sign the pledge were not considered eligible to return to a normal program

24  because prison officials either considered them a threat or could not assess what threat they

25  posed to other inmates or staff.

26          Further, the pledge requirement was not put in place simply as a routine matter in a

27  prison facility with no history of violence; instead, it was a considered response to a history

28  of violence at SVSP, and in particular in Facility C, that had led to lockdowns and modified

**United States District Court**
For the Northern District of California

1  programming for a number of years.  As set forth in Ponder's October 17, 2005

2  memorandum to Facility C inmates, the July 14, 2005 stabbing event was just the latest in a

3  string of violent incidents in Facility C.  Moreover, the undisputed evidence shows that

4  following the stabbing incident and through June 2006, there were several other documented

5  threats and assaults that took place at SVSP, and in Facility C, which further threatened the

6  safety and security of the institution and hindered the ability of staff to return Facility C to

7  normal programming.  (Celaya Decl. ¶¶ 7-13 (listing occurrences).)

8          Ponder's October 17, 2005 memorandum also reflects the belief of prison officials that

9  the ongoing violence at SVSP was being tolerated by inmates due to gang politics and peer

10  pressure within the inmate population.  As a result, prison officials determined they would

11  have to try to break that tolerance and, in so doing, the inmates' acceptance of prison

12  violence.  Consequently, the pledge requirement was used to differentiate between those

13  inmates who were willing to commit to programming non-violently and those who were not.

14          Although plaintiff claims the pledge requirement was used to punish him and,

15  therefore, was not rationally connected to legitimate penological objectives, he does not

16  dispute the following: (1) the pledge assisted prison officials in documenting and separating

17  inmates who were willing to program without violence; (2) even after he refused to sign the

18  pledge he was placed on a list for further administrative review of his programming potential;

19  and (3) in addition to refusing to sign the pledge, plaintiff had a disciplinary history of

20  disobeying orders and threatening inmates and staff, and of interacting with gang members

21  on the yard.  (Pl.s' Depo. at 129:21-23 (acknowledging he was accused of threatening

22  inmates), 131:22-124 (acknowledging fighting with inmate), 205:3-15 (acknowledging

23  "hanging out" with gang members on prison yard), 235:2-23 (acknowledging refusal to

24  work); 237:10-21 (acknowledging rules violation report and loss of credits for threatening

25  staff), 244:8-246:8 (acknowledging refusal to comply with direct order from staff), 249:21-

26  250:3 (acknowledging refusal to work), 252:11-20, 259:18-261:6 (acknowledging refusal to

27  participate in mandatory DNA testing), 261:9-262:2 (acknowledging battery on inmate),

28  264:2-22 (acknowledging he was found guilty of obstructing a peace officer).)  Based on

United States District Court
For the Northern District of California

these undisputed facts, prison officials could rationally conclude, in the interest of institutional security, that plaintiff should not be returned to a normal program until he signed the pledge.

According deference to the views of prison authorities, see Beards, 548 U.S. at 530, the Court finds the decision by prison officials to place inmates, such as plaintiff, who would not sign the CDC-128-B pledge and had a disciplinary history of violations involving threats and disobeying orders, at the bottom of the list for consideration to be returned to a normal program, was a common-sense approach to addressing the systemic problem of unsafe prison conditions in Facility C.  As plaintiff does not present evidence that refutes a common-sense connection between the pledge requirement and the legitimate penological objective of institutional security, the first Turner factor weighs in favor of upholding the pledge requirement.

           b.     Second Turner Factor

The second factor identified by Turner for purposes of determining the reasonableness of a restriction "is whether there are alternative means of exercising the right that remain open to the prison inmates." Turner, 482 U.S. at 90.  If such alternative means remain open, the court should be particularly conscious of the measure of judicial deference owed to corrections officials.  Id.

Defendants argue that asking plaintiff to sign the CDC-128-B pledge as an indication of his willingness to program without violence did not foreclose plaintiff from alternative means of exercising his First Amendment right to express his political beliefs.  In particular, defendants point out that plaintiff remained free to refuse to sign the pledge and did so, thereby exercising his First Amendment rights.  Further, defendants argue, there is no evidence that the pledge required plaintiff to adopt a position not already required by prison rules and regulations, or that plaintiff was prohibited from complaining, officially or to other inmates, about his objection to the pledge requirement.

In response, plaintiff asserts that the pledge foreclosed his ability to express his political beliefs because his attempts to pursue administrative grievances and complaints

United States District Court

For the Northern District of California

about the pledge were rejected, he was threatened with discipline if he continued to pursue the grievances, and the pledge itself required that he waive his First Amendment rights or be punished.

Plaintiff has not produced evidence that creates a triable issue with respect to his claim that the pledge foreclosed him from alternative means of exercising his First Amendment rights. As noted, the language of the pledge itself neither requires an inmate to waive First Amendment rights nor imposes punishment without a hearing. Rather, it merely requires the inmate to pledge his intent to follow prison rules and regulations, not commit violence, and acknowledge that the program-review process was ongoing. Further, while plaintiff's administrative appeals and complaints were rejected, it was not because he refused to sign the pledge. The undisputed evidence produced by plaintiff shows his grievances either were reviewed and rejected on the merits, or were rejected for procedural reasons, with plaintiff being warned that if he did not follow proper procedures in the future he would face the possibility of disciplinary action. (Opp. Exs. D & E.)

Accordingly, because the pledge did not foreclose plaintiff from exercising his First Amendment right to express his political beliefs, the second Turner factor weighs in favor of upholding the pledge requirement.

c.   Third Turner Factor

The third Turner factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." Turner, 482 U.S. at 91. Defendants argue that accommodating plaintiff's asserted First Amendment right to refuse to sign the pledge and still be returned to a normal program would negatively impact prison staff and other inmates by interfering with defendants' efforts to return Facility C to a normal program and maintain the safety and security of the institution. Specifically, defendants assert that allowing an inmate who refused to sign the pledge to return to a normal program would have made the programming plan ineffective, as there would have been no incentive for any inmate to interview or sign the pledge. Consequently, prison officials would not be able to obtain their

United States District Court
For the Northern District of California

1  goal of turning Facility C into a safer and more secure facility by identifying those inmates

2  who were willing to commit to programming without violence.

3        In response, plaintiff argues that allowing him to return to a normal program despite

4  his refusal to sign the pledge would not have adversely impacted prison officials' attempts to

5  create a safe environment in Facility C, because other inmates who did not sign the pledge

6  were allowed to return to a normal program.  In support of his contention, plaintiff submits

7  declarations from four inmates who state they were returned to normal programming without

8  being required to sign the pledge.  (Opp. at 22-23 & Ex. H (Decls. of Clarke, Frazier, Dotton

9  and Brown).)  Defendants contend these declarations are insufficient to create a triable issue

10  because they provide no information with respect to those inmates' disciplinary histories,

11  propensities for violence, threat levels, or programming capabilities.  By contrast, as noted

12  above, plaintiff has an undisputed disciplinary history of disobeying staff orders, making

13  threats, and committing violence in prison.  Thus, defendants argue, in light of plaintiff's

14  refusal to sign the pledge and his disciplinary history, it was reasonable for prison officials to

15  classify him as an unknown risk to prison staff and other inmates, and subject him to further

16  administrative review before he could be returned to a normal program.

17        The Court finds plaintiff has failed to produce evidence that creates a triable issue

18  with respect to plaintiff's claim that accommodating his asserted First Amendment right to be

19  returned to a normal program without signing the pledge would not have adversely affected

20  prison officials' attempts to return Facility C to a safe and secure facility.  Accordingly, the

21  third Turner factor weighs in favor of upholding the pledge requirement.

22              d.    Fourth Turner Factor

23        The fourth Turner factor requires the court to consider whether there is an absence of

24  ready alternatives to the prison regulation.  The burden is on the prisoner challenging the

25  regulation, not on prison officials, to show there are obvious, easy alternatives to the

26  regulation.  Turner, 482 U.S. at 91.  "This is not a 'least restrictive alternative' test: prison

27  officials do not have to set up and then shoot down every conceivable alternative method of

28  accommodating the claimant's constitutional complaint."  Id.  Instead, the proper inquiry is

United States District Court
For the Northern District of California

1  "whether the prisoner has pointed to some obvious regulatory alternative that fully

2  accommodates the asserted right while not imposing more than a *de minimis* cost to the valid

3  penological goal." <u>Overton v. Bazzetta</u>, 539 U. S. 126, 135-36 (2003); <u>see</u> <u>Mauro v. Arpaio</u>,

4  188 F.3d 1054, 1063 (9th Cir. 1999) (finding in favor of defendants on fourth <u>Turner</u> factor

5  where plaintiff failed to point to alternative that accommodated his rights at *de minimis* cost

6  to security interests).

7      Plaintiff asserts the CDC-128-B pledge was an exaggerated response to institutional

8  security concerns because signing the pledge cannot prevent future violence.  As an

9  alternative, plaintiff suggests that "an obvious and easy way" for prison officials to achieve

10  institutional security is to retain "dedicated" staff of "skilled" employees who have a "high

11  degree of morale."  (Opp. at 24-25.)

12      Defendants acknowledge the pledge was not a panacea for preventing prison violence;

13  they argue, however, that it was a reasonable means of attempting to create a safer and more

14  secure environment in Facility C, because it assisted prison officials in assessing an inmate's

15  willingness to program without violence.  Defendants further argue that plaintiff has not

16  shown an easy alternative to the pledge requirement because his suggested alternative does

17  not directly assist prison officials either with assessing which inmates have programming

18  potential or with returning the affected facilities to normal programming.  Moreover,

19  defendants assert, plaintiff's suggestion is not an "alternative" at all, because maintaining the

20  type of staff suggested by plaintiff has always been the policy of the CDCR.  <u>See</u> Cal. Code

21  Regs., tit. 15, §§ 3391-3416 (governing employee conduct and hiring practices).

22      The Court finds plaintiff has not put forth a ready alternative to the pledge

23  requirement that would accommodate his First Amendment rights at a *de minimis* cost to

24  prison officials' legitimate security concerns.  Accordingly, the fourth <u>Turner</u> factor weighs

25  in favor of upholding the pledge requirement.

26      2.   <u>Conclusion</u>

27      For the reasons discussed above, the Court concludes plaintiff has not created a

28  genuine issue of material fact with respect to his claim that defendants violated his First

United States District Court
For the Northern District of California

Amendment rights by requiring that he sign the CDC-128-B pledge before being returned to a normal program.  In particular, plaintiff has not produced evidence that creates a triable issue with respect to whether the pledge requirement infringed plaintiff's right to express his political beliefs.  Moreover, defendants have shown that the pledge requirement is reasonably related to legitimate penological objectives.  Accordingly, defendants are entitled to summary judgment on plaintiff's First Amendment claim.

C.   Fourteenth Amendment Claim

Plaintiff claims his right to equal protection under the Fourteenth Amendment was violated when prison officials treated him differently than similarly situated inmates by retaining him on modified program status when he refused to sign the CDC-128-B pledge.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Where a prisoner claims his right to equal protection has been violated, the proper question for this Court's determination is that set forth in Turner v. Safley, supra, specifically, whether the regulation or practice claimed to violate the prisoner's right to equal protection is reasonably related to legitimate penological interests.  See Washington v. Harper, 494 U.S. 210, 223-25 (1990); see, e.g., Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (holding Turner standard must be applied to prisoner's claim of disparate treatment based on religion).[4]  To succeed on an equal protection claim, a prisoner must show that officials intentionally acted in a discriminatory manner.  See More v. Farrier, 984 F.2d 269, 271-72 (8th Cir. 1993) (holding that absent evidence of invidious discrimination federal courts should defer to judgment of prison officials).

[4]The one exception to application of the Turner standard to a prisoner's equal protection claims is implicated where a prisoner alleges the violation of his right to racial equality; prison officials must demonstrate that race-based classifications are narrowly tailored to serve a compelling state interest.  Johnson v. California, 543 U.S. 499, 511-13 (2005).  No race-based classification is alleged herein.

16

United States District Court
For the Northern District of California

1    Thus, to defeat summary judgment on his equal protection claim, plaintiff must set

2    forth specific facts showing there is a triable issue as to whether (1) he was treated differently

3    from similarly situated inmates; (2) such unequal treatment was not reasonably related to a

4    legitimate penological objective; and (3) such unequal treatment was the result of invidious

5    discrimination against plaintiff.

6        As an initial matter, plaintiff asserts he was treated differently than similarly situated

7    inmates who did not sign the CDC-128-B pledge but nevertheless were allowed to return to

8    normal programming.  In support of this contention, plaintiff has submitted the declarations

9    of inmates Clarke and Frazier.  (Opp. at 26 & Ex. H.)  The declaration of Clarke, however,

10   cannot create a triable issue with respect to plaintiff's claim because it is irrelevant thereto.

11   Specifically, as defendants point out, Clarke's declaration pertains to his refusal, in 2001, to

12   interview or sign a pledge concerning the 2001 murder of an inmate in the Facility A dining

13   room at SVSP.  (See Ex. H Clarke Decl.)  The declaration thus has no bearing on prison

14   officials' use of the pledge requirement with respect to the 2005 stabbing of two correctional

15   officers by an inmate in Facility C.  Additionally, Frazier's declaration is insufficient to

16   create a triable issue as to plaintiff's claim of differential treatment because it provides no

17   information concerning Frazier's disciplinary history or propensity for violence.  As noted,

18   plaintiff had a history of disciplinary problems, which prison officials relied upon in addition

19   to plaintiff's refusal to sign the CDC-128-B pledge when deciding to retain him on modified

20   program status.

21       Further, as discussed above in detail, plaintiff has not produced evidence that creates a

22   triable issue with respect to the legitimate penological objectives put forth by defendants to

23   justify the pledge requirement.  In particular, the Court has found the decision herein at issue

24   was a common-sense approach to addressing the systemic problem of unsafe prison

25   conditions in Facility C, specifically, the decision by prison officials to place at the bottom of

26   the list for consideration to be returned to a normal program those inmates, such as plaintiff,

27   who would not sign the CDC-128-B pledge and had a disciplinary history of violations

28   involving threats and disobeying orders.

1    Finally, plaintiff's argument that prison officials acted with discriminatory intent

2  because they allegedly failed to prevent the 2005 stabbing incident is without merit.  Not

3  only is the assertion factually unsupported, it is irrelevant to plaintiff's equal protection claim

4  because it has no bearing on defendants' state of mind when they decided to retain plaintiff

5  on modified program status for refusing to sign the pledge.

6    In sum, plaintiff has failed to present evidence that creates a triable issue with respect

7  to his claim that he was treated differently from similarly situated inmates in violation of the

8  Fourteenth Amendment.  Accordingly, defendants are entitled to summary judgment on

9  plaintiff's equal protection claim.

10  D.    Eighth Amendment Claim

11    As noted, plaintiff was denied outdoor exercise during the time he was on modified

12  program status, a period of approximately thirteen months.  Plaintiff claims such denial

13  violated his rights under the Eighth Amendment.

14    The Constitution does not mandate comfortable prisons, but neither does it permit

15  inhumane ones.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The treatment a prisoner

16  receives in prison and the conditions under which he is confined are subject to scrutiny under

17  the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 31 (1993).  Exercise is one of

18  the basic human necessities protected by the Eighth Amendment.  LeMaire v. Maass, 12 F.3d

19  1444, 1457 (9th Cir. 1993).

20    A prison official violates the Eighth Amendment when two requirements are met:

21  (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the prison official

22  possesses a sufficiently culpable state of mind.  Farmer, 511 U.S. at 834.

23    1.    Sufficiently Serious Deprivation

24    In determining whether a deprivation of a basic necessity is sufficiently serious to

25  satisfy the objective component of an Eighth Amendment claim, a court must consider the

26  circumstances, nature, and duration of the deprivation.  The Ninth Circuit has continuously

27  held that the long-term deprivation of outdoor exercise for prisoners constitutes a sufficiently

28  serious deprivation under the Eighth Amendment.  See LeMaire, 12 F.3d at 1458 (holding

18

1   deprivation of outdoor exercise for "considerable periods of time" during five-year period of

2   incarceration meets objective requirement of Eighth Amendment claim); Lopez v. Smith, 203

3   F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (holding denial of outdoor exercise for six and

4   one-half weeks meets objective prong of Eighth Amendment deliberate indifference claim);

5   Allen v. Sakai, 48 F.3d 1082, 1087-88 (9th Cir. 1994) (holding denial of outdoor exercise for

6   six weeks to prisoner in indefinite segregation sufficient to satisfy objective requirement of

7   Eighth Amendment analysis), cert. denied, 514 U.S. 1065 (1995); Toussaint v. Yockey, 722

8   F.2d 1490, 1493 (9th Cir. 1984) (holding denial of outdoor exercise for over one year to

9   prisoners assigned to administrative segregation raised "substantial constitutional question").

10          Defendants argue that the denial of outdoor exercise to plaintiff for more than a year

11   was not a sufficiently serious deprivation within the meaning of the Eighth Amendment

12   because the denial resulted from plaintiff's choosing not to sign the CDC-128-B pledge.

13   Specifically, defendants maintain, plaintiff was "the master of his own fate" and, therefore,

14   by his declining numerous opportunities to gain access to outdoor exercise by signing the

15   pledge, "it is logical to conclude that exercise must not have been necessary for him between

16   July 14, 2005 and August 31, 2006 (the period at issue)."  (Reply at 4:27-5:2.)

17   Consequently, defendants reason, the deprivation could not have been sufficiently serious to

18   satisfy the objective component of an Eighth Amendment violation.

19          Under the facts alleged by plaintiff, and viewing them in the light most favorable to

20   him, the Court finds defendants' argument unpersuasive.  The Ninth Circuit has recently

21   made clear that a sufficiently serious deprivation may be established even when such

22   deprivation has resulted from an inmate's refusal to abide by a prison policy that serves

23   legitimate penological interests.  See Foster v. Runnels, No. 06-15719, 2009 WL 260972, at

24   *5 (9th Cir. Feb. 5, 2009) (finding prisoner established sufficiently serious deprivation under

25   objective prong of Eighth Amendment inquiry where he repeatedly was denied food due to

26   his refusal to comply with legitimate prison policy prohibiting inmates from covering cell

27   windows).

28          Accordingly, based on the undisputed fact that plaintiff was denied outdoor exercise

19

1   for the thirteen months he was on modified program status, the Court finds plaintiff has met

2   the objective requirement of the Eighth Amendment inquiry.

3          2.    Sufficiently Culpable State of Mind

4          A prison official cannot be held liable under the Eighth Amendment for denying an

5   inmate humane conditions of confinement unless the standard for criminal recklessness is

6   met, i.e., the official knows of and disregards an excessive risk to inmate health or safety.

7   See Farmer, 511 U.S. at 837.  The official must both be aware of facts from which the

8   inference could be drawn that a substantial risk of serious harm exists, and he must also draw

9   the inference.  See id.  Prison officials who lacked knowledge of a risk, however, cannot be

10  said to have inflicted punishment.  Id. at 844.  Consequently, prison officials can prove they

11  were unaware even of an obvious risk to inmate health or safety by showing, for example,

12  "that they did not know of the underlying facts indicating a sufficiently substantial danger

13  and that they were therefore unaware of a danger, or that they knew the underlying facts but

14  believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or

15  nonexistent."  Id.

16         Additionally, prison officials who actually knew of a substantial risk to inmate health

17  or safety may be found not to have acted with deliberate indifference if they responded

18  reasonably to the risk, even if the harm ultimately was not averted.  Id.  "A prison official's

19  duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates

20  due regard for prison officials' unenviable task of keeping dangerous men in safe custody

21  under humane conditions."  Id. at 844-45 (internal quotations and citations omitted).

22  Consequently, prison officials who act reasonably cannot be found liable for an Eighth

23  Amendment violation.  Id. at 845.

24         Defendants first argue they did not know of and disregard an excessive risk to

25  plaintiff's health and safety by denying him outdoor exercise because plaintiff could have

26  availed himself of exercise at any time by signing the CDC-128-B pledge and his refusal to

27  do so thus indicated he was not suffering serious harm from the deprivation.  In response,

28  plaintiff asserts only that he was "excessively confined" to his cell for thirteen months.

(Opp. at 8.)  Plaintiff, however, has not produced evidence showing that, other than prison officials'  awareness of plaintiff's general objection to the denial of exercise, such officials had reason to believe plaintiff faced a substantial danger to his health from the lack of exercise.  Thus, even though prison officials knew plaintiff was being denied access to outdoor exercise because of his refusal to sign the pledge, the undisputed evidence shows they believed the risk of harm to plaintiff was "insubstantial or nonexistent," Farmer, 511 at 844, because plaintiff could have signed the pledge at any time and gained immediate access to outdoor exercise.

Defendants further argue they did not act with deliberate indifference because they acted reasonably by denying plaintiff access to exercise based on legitimate security concerns in Facility C.  Prison officials may limit or deny exercise for security reasons.  See LeMaire, 12 F.3d at 1458 (upholding long-term denial of outdoor exercise to prisoner who represented "grave security risk" because of history of extensive serious misconduct); Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir. 1980) (upholding five-month deprivation of outdoor exercise following lockdown initiated in response to "genuine emergency"), cert. denied, 451 U.S. 937 (1981); cf. Spain, 600 F.2d at 199 (upholding right of inmates in indefinite segregation to outdoor exercise "one hour per day, five days a week unless inclement weather, *unusual circumstances, or disciplinary needs* made that impossible.") (emphasis added).  Here, defendants have produced uncontradicted evidence of the following: (1) Facility C was placed on lockdown and then modified program in response to a "genuine emergency," (2) there was a rational connection between requiring inmates to sign the CDC-128-B pledge and restoring institutional security, (3) plaintiff repeatedly refused to sign the pledge, (4) plaintiff had a lengthy disciplinary history, which included refusing to obey staff orders and threatening staff and other inmates, and (5) as a result of plaintiff's refusal to sign the pledge and his disciplinary history, defendants were unable to assess the level of threat plaintiff posed to staff and other inmates should he be returned to a normal program.  Further, it is undisputed that for almost a year after the July 14, 2005 stabbing incident, through June 2006, there were several other documented threats and assaults that took place at SVSP and

21

United States District Court
For the Northern District of California

1  in Facility C that threatened the safety and security of the institution and hindered the ability

2  of staff to return Facility C to normal programming.  (Celaya Decl. ¶¶ 7-13 (listing

3  occurrences).)

4          When restricting exercise privileges of inmates who pose security concerns, "prison

5  officials are authorized and indeed required to take appropriate measures to maintain prison

6  order and discipline and protect staff and other prisoners . . ."  LeMaire, 12 F.3d at 1458.  For

7  the reasons discussed above, the Court finds plaintiff has failed to create a triable issue with

8  respect to whether defendants subjectively acted with deliberate indifference when they

9  denied plaintiff access to outdoor exercise while he was on modified program status.

10  Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment

11  claim.[5]

12  E.    Plaintiff's Motions for Judicial Notice

13          Plaintiff has filed a motion asking the Court to take notice of portions of his

14  deposition transcript, which portions he asserts are not "true and correct" because they have

15  been tampered with by defendants.  Plaintiff has not, however, specifically identified the

16  relevant portions or attached them to his motion, nor does he state that defendants have in

17  any way relied on such material in support of their summary judgment motions.

18          The Court previously explained to plaintiff, in response to a prior motion filed by

19  plaintiff in which he asked the Court to review the deposition transcript for errors, that if

20  plaintiff objects to defendants' characterization of statements made by plaintiff at his

21  deposition, or their characterization of exhibits submitted by plaintiff at his deposition, and

22  such objections are relevant to plaintiff's opposition to defendants' motion for summary

23  judgment, plaintiff must raise his objections in his opposition and attach thereto a copy of

24  those portions of the deposition transcript or exhibits.  (Order, filed Oct. 30, 2008, at 2:13-

25

26          [5]In light of the Court's determination that defendants did not violate plaintiff's
   constitutional rights under the First, Fourteenth or Eighth Amendments, the Court does not
27  reach defendants' argument that they are entitled to qualified immunity on plaintiff's claims.
   Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been
28  violated were the allegations established, there is no necessity for further inquiries
   concerning qualified immunity.")

17.)

As noted, however, plaintiff has not identified those portions of the deposition transcript to which he objects and, more importantly, has not shown that defendants have relied on such portions in support of their motions for summary judgment.  Consequently, he has not shown the alleged errors have any bearing on this Court's determination of the merits of defendants' motions.  Accordingly, plaintiff's motion will be denied.

In addition to the above-described motion, plaintiff has filed a separate motion asking the Court to take judicial notice, under Rule 201 of the Federal Rules of Evidence, of various documents he filed in support of his December 17, 2008 opposition to defendants' summary judgment motions.  As an initial matter, the Court notes that there is no need for the Court to take judicial notice of the various sections of the California Code of Regulations submitted by plaintiff, or the first page of the Court's Order of Service in this matter, as they are not "adjudicative facts" within the meaning of Rule 201.

With respect to the other documents submitted by plaintiff, which appear to be inmate appeals or complaints submitted to prison officials after the instant action was filed, the Court agrees with defendants that such documents do not meet the requirements for judicial notice as the allegations therein are not facts that are "not subject to reasonable dispute."  See Fed. R. Evid. 201(b).  Further, many of the documents appear to be duplicative of documents filed by plaintiff in support of his opposition to defendants' motions for summary judgment.  Finally, to the extent plaintiff seeks judicial notice of documents concerning events that occurred after this action was filed, plaintiff makes no showing as to their relevance to the Court's disposition of the claims raised by plaintiff herein.  Accordingly, plaintiff's motion will be denied.

**CONCLUSION**

For the foregoing reasons, the Court orders as follows:

1.  Defendants motions for summary judgment are hereby GRANTED and judgment shall be entered in favor of each of the defendants.  (Docket Nos. 22 & 43.)

2.  Plaintiff's motions for judicial notice are hereby DENIED.  (Docket Nos. 55 & 56.)

23

United States District Court
For the Northern District of California

1    This order terminates Docket Nos. 22, 43, 55 and 56.

2    The Clerk shall close the file.

3    IT IS SO ORDERED.

4    DATED: February 24, 2009

5                                                                    _____
                                                                     MAXINE M. CHESNEY
6                                                                    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States **District Court**
For the Northern District of California

24