IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OTIS THOMAS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>M.S. EVANS, Warden, et al., )<br>)<br>Defendants. )<br>)<br>_____ ) | No. C 06-3581 MMC (PR)<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS; DISMISSING AS MOOT PLAINTIFF'S CLAIMS FOR INJUNCTIVE RELIEF; REFERRING CASE TO FEDERAL PRO BONO PROJECT FOR ASSIGNMENT OF COUNSEL; STAYING PROCEEDINGS PENDING APPOINTMENT OF COUNSEL; DIRECTIONS TO CLERK**<br><br>**(Docket No. 98)** |

On June 5, 2006, plaintiff, a California prisoner currently incarcerated at Centinela State Prison and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983, alleging violation of his constitutional rights by prison officials at Salinas Valley State Prison ("SVSP"). On July 5, 2006, plaintiff filed an Amended Complaint ("AC"), which is the operative pleading herein.

In its Order Granting Defendants' Motion for Summary Judgment, filed February 24, 2009, the Court granted summary judgment in favor of all defendants on plaintiff's First Amendment, Eighth Amendment and Equal Protection claims. (Docket No. 62.) Thereafter, plaintiff appealed the Court's ruling with respect to his Eighth Amendment claim.

On appeal, the Ninth Circuit, in an opinion filed July 26, 2010, reversed the Court's grant of summary judgment on the Eighth Amendment claim. See Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010). Specifically, the Ninth Circuit found, as a matter of law, that prison officials knew of a substantial risk of serious harm to plaintiff's physical and mental health when they denied plaintiff exercise for a prolonged period during plaintiff's confinement in the maximum security housing unit. See id. at 1152. Additionally, the Ninth Circuit found a triable issue of material fact existed, specifically, whether prison officials acted reasonably when they denied plaintiff exercise during such period. See id. at 1153-55. Accordingly, the Ninth Circuit remanded the case to this Court for further proceedings.

Thereafter, the Court reopened the action and referred the matter to Magistrate Judge Nandor Vadas for settlement proceedings, which proceedings took place on March 22, 2011. (Docket Nos. 78, 81.) The parties did not reach a settlement agreement. (Docket No. 89.)

Now pending before the Court is defendants' motion for summary judgment on grounds of qualified immunity ("Mot. Summ. J. III").[1] Plaintiff has filed an opposition to the motion, and defendants have filed a reply.

## FACTUAL BACKGROUND[2]

The events underlying plaintiff's claims occurred in 2005 to 2006 in Facility C, a level IV maximum security housing unit, at SVSP. At all relevant times herein, plaintiff was a level IV prisoner housed in Facility C, defendant G. Ponder ("Ponder") was the captain of Facility C, defendant M. Kircher ("Kircher") was a correctional officer in Facility C, and defendant M. S. Evans ("Evans") was the warden at SVSP. (AC at 2.)

//
//

---

[1] The instant motion is defendants' third motion for summary judgment in this action. On April 11, 2007, defendants filed a motion for summary judgment on plaintiff's First Amendment and Equal Protection claims ("Mot. Summ. J. I"); on August 7, 2008, defendants filed a motion for summary judgment on plaintiff's Eighth Amendment claim ("Mot. Summ. J. II").

[2] Unless otherwise noted, the facts set forth in this section are undisputed.

2

A.    Modified Program for Facility C Inmates

Inmates are housed in Facility C for various reasons, including a history of assaultive behavior and disciplinary actions, gang-related convictions, and lengthy or life sentences. (Decl. Def. Ponder Supp. Defs.' Mot. Summ. J. III ("Ponder Decl.") ¶¶ 26, 27.) On July 14, 2005, in Facility C, an inmate, using a homemade knife, stabbed and almost killed two correctional officers. (Id. ¶¶ 7, 11.) As a result of the incident, SVSP was placed on lockdown. (Id. ¶ 53.) Eventually, the lockdown was lifted for all housing units with the exception of Facility C which, before the incident, had been in the process of returning to a normal program after a previous violent incident. (Id. ¶¶ 53, 54.) Facility C remained on lockdown until September 9, 2005, when it transitioned from lockdown to a "modified program." (Id.)

During a modified program, Facility C maintains essential services such as health care, hygiene, meals, hearings, and access to courts. (Id. ¶ 14.) Other services such as canteen, quarterly packages, recreation, visiting, phone calls, and religious services are limited, suspended, or offered to certain inmates based on various risk-assessment factors. (Id.)

A modified program allows time for staff to inspect the crime scene, collect and preserve evidence, gather intelligence, identify suspects and witnesses, obtain statements, document the incident, conduct searches, and evaluate overall operations. (Id. ¶ 13.)

B.    Plan to Return Facility C to Normal Program

In October 2005, SVSP completed the investigation of the July 14, 2005 stabbing incident. (Id. ¶ 56.) On October 17, 2005, Ponder sent a memorandum to Facility C inmates, updating them on the program status of Facility C and explaining what they would be required to do to be returned to a normal program. The memorandum explained the following steps were being taken in response to a recent history of ongoing violence in Facility C:

> Prior to the attempted murder of the two Correctional Officers, the facility was operating under four separate modified programs. Over the last few years C Facility has operated on continuing modification due to the violence within the

3

> facility.  The motives of each disturbance have varied, however the singular driving force behind each incident has been level IV inmate's [sic] politics which are predominately gang related.  The inmate population succumbs to this peer pressure and condones this violence as acceptable in a level IV 180 general population setting.  This attitude and violence has continued over a substantial period of time.  During meetings with various inmates on the facility during classification and tours of the units, inmates repeatedly have confirmed this verbally as well as by their actions to staff.  This is unacceptable.  This jeopardizes the safety and welfare of every person who lives and works on the facility.
>
> Although incarcerated, each inmate is expected to be a law abiding citizen, the choice to program and rehabilitate oneself falls directly on each individual inmate.
>
> I am developing a process to help the facility work towards providing inmates that want to program without violence an opportunity to do so.  The choice to program will be in the hands of each individual inmate.  The first step in this process will be interviews.  The next step will be your commitment to program without violence and verification of this commitment by signing that fact.  The next process will involve Correctional Officers identifying inmates that have shown willingness to program and providing a list of those inmates to supervisory staff.
>
> Inmates that fail to act in accordance with Departmental rules and Institution procedures will result in housing and program changes.  Inmates are advised that their privileges and access to programs will be curtailed until you as an individual successfully comply with this process.
>
> In closing, your program is in your own hands.  Program is available to any and all general population inmates.  All you need is the willingness and commitment to program without violence.

(Ponder Decl., Ex. 1 at MSJ-QI 4.)

Ponder's plan included interviewing each inmate in a private setting.  (Ponder Decl. ¶ 58.)  Each inmate was required to answer a set of pre-determined questions from an interview form. (Id.)  At the end of the interview, each inmate was required to sign his name at the bottom of the interview form.  (Id.)

At each interview, the inmate would also be asked to sign a CDC-128-B "pledge."[3] (Id. ¶ 60.)  The CDC-128-B pledge stated:

---

[3] "CDC-128-B" is the form number used by the California Department of Corrections and Rehabilitation ("CDCR") to identify departmental memoranda, but not the contents thereof.  The Court refers to the CDC-128-B included in Exhibit 1 to defendant Ponder's declaration, and which constitutes the basis for much of the dispute herein, as the "CDC-128-B pledge."

4

> I am currently housed within Facility 'C' Salinas Valley State Prison. I am also aware that this facility is on modified program status based upon several acts of violence having occurred within the past 15 months.
>
> By signing this document, I am advising staff that I want to participate in the program review process being implemented at this time. I am also stipulating that I want to "do my own time" and will program by not participating in gang violence.
>
> I have been advised that my failure to act in accordance with institutional rules and procedures may result in program and housing changes. I am aware that during the time I participate in the program review process, I will retain my established work/privilege group.
>
> I am aware, if I am unassigned and I participate in the program review process that my participation does not constitute a credit earning assignment. Further, I understand that my privileges and access to programs will be curtailed until I successfully complete this program and am returned to normal general population program status.
>
> I have been advised that the program review process is ongoing and that I will be expected to maintain compliance with regulations to participate. During the program review process I will be required to interact with other inmates of all races and ethnicity during all out of cell activities. The process and my participation in it, is on-going and monitered. [sic] During this period I understand that my progress and suitability to remain in the program will be monitored and evaluated by staff.

(Ponder Decl. Ex. 1 at MSJ-QI 15.)

The inmates who completed the pledge program were returned to a normal program, including outdoor exercise. (Ponder Decl. ¶ 57.) According to defendants, the pledge program was not difficult to complete. (Id.)

Inmates who did not complete the pledge program were placed at the bottom of the list for further program review. (Id. at ¶ 65.) Inmates who failed the pledge program after two tries were referred to a classification committee for appropriate programming and housing needs. (Id. at ¶ 66.)

C.   Plaintiff's Refusal to Sign the CDC-128-B Pledge

Following defendant Ponder's implementation of the above plan, plaintiff was interviewed on November 2, 2005. (Id. ¶ 67.) Plaintiff answered all of the questions on the interview form, after which he and a prison official signed the form. (Id., Ex. 1 at MSJ-QI 16-17.) The interview form included the following statement and question: "Programming on a level IV general population yard requires participation without violence. Are you

5

1 willing to commit to this type of program? If no, give details?" In response to this question
2 plaintiff wrote "Yes." (Id.) To the question "Do you have any safety concerns?" plaintiff
3 answered "No." (Id.) The question "If the facility were returned to normal program, could
4 you program without violence on a level IV general population yard with inmates from all
5 races/ethnics [sic] or past or present gang affiliations?" also appeared on the form, and in
6 response to this question plaintiff answered "Yes." (Id.)

Additionally, at plaintiff's November 2, 2005 interview, he was asked to sign the CDC-128-B pledge, but refused to do so. (Ponder Decl., ¶ 67 & Ex. 1 at MSJ-QI 15.) Subsequently, on November 4, 2005, Ponder sent a memorandum to plaintiff, informing him he had failed to complete the interview process or had interviewed in such a manner that prison staff could not determine the level of threat he posed to staff or inmates. (Id. ¶ 68 & Ex. 1 at MSJ-QI 6.) As a result, plaintiff was informed:

> [Y]ou will remain on modified program status to include **personal hygiene canteen draw only, no quarterly packages, no special purchase**. Also due to your refusal/failure to comply with the interview process and administrations [sic] inability to ascertain your threat status you will be placed on **non-contact visiting**. These modifications will remain in effect until further notice.

(Id.) Further, plaintiff was informed he would be placed at the bottom of the interview list to be reviewed for program potential. (Id.)

Plaintiff was interviewed several times after November 4, 2005 but continued to refuse to sign the CDC-128-B pledge. (Ponder Decl. ¶ 68.)

Plaintiff remained on modified program status until August 31, 2006, when he signed the CDC-128-B pledge. (Ponder Decl. ¶ 73.) Soon thereafter, he was returned to a normal program, including outdoor exercise. (Id.) As a result of being on modified program status, plaintiff was denied outdoor exercise for almost 14 months.

**DISCUSSION**

A. <u>Legal Standard</u>

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Material facts are those that may affect the

outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Id. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See id at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. Inc., v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

B.  Eighth Amendment Claim/Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Saucier v. Katz, 533 U.S. 194, 202

7

(2001)[4] (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Officials can have a "reasonable, but mistaken," belief about what the law requires in any given situation. Saucier, 533 U.S. at 206. "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).

A court considering a claim of qualified immunity must determine: (1) whether "a plaintiff has alleged . . . a violation of a constitutional right," and (2) whether "the right at issue was clearly established at the time of defendant's alleged misconduct." See Pearson, 555 U.S. at 232 (internal quotation and citation omitted). Courts may exercise their discretion in deciding which prong of the test to address first, in light of the particular circumstances of the case. Id. at 236.

As discussed above, the Ninth Circuit previously found plaintiff had alleged a violation of his Eighth Amendment rights. Consequently, this Court proceeds to the second question: whether the right at issue was clearly established at the time defendants acted.

1. Clearly Established Law

The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. See Saucier, 533 U.S. at 202. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. If the law did not put the officer "on notice" that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Id.

To determine whether a right was clearly established, the court looks to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." Community House, Inc. v. Boise, 623 F.3d 945, 967 (9th Cir. 2010) (citing Osolinski v. Kane, 92 F.3d 934, 936 (9th

---

[4] Overruled on other grounds by Pearson v. Callahan, 555 U.S. 223, 236 (2009).

8

1 Cir. 1996)). It is not necessary that a prior decision rule "the very action in question"
2 unlawful for a right to be clearly established. Anderson v. Creighton, 483 U.S. 635, 640
3 (1987); see, e.g., Watts v. McKinney, 394 F.3d 710, 713 (9th Cir. 2005) (stating, in context
4 of excessive force claim, "[t]he Supreme Court did not need to create a catalogue of all the
5 acts by which cruel and sadistic purpose to harm another would be manifest"); Jackson v.
6 McIntosh, 90 F.3d 330, 331-32 (9th Cir. 1996) (rejecting, in context of medical indifference
7 claim, defendants' contention they were entitled to qualified immunity because there was no
8 clearly established law requiring them to provide kidney transplant to prisoner on dialysis;
9 holding defendants stated issue too narrowly).

10 The Ninth Circuit has continuously held that the long-term denial of outdoor exercise
11 for prisoners constitutes a sufficiently serious deprivation under the Eighth Amendment. See
12 Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (holding denial of outdoor
13 exercise for six and one-half weeks meets objective prong of Eighth Amendment deliberate
14 indifference claim); Allen v. Sakai, 48 F.3d 1082, 1087-88 (9th Cir. 1994) (holding denial of
15 outdoor exercise for six weeks to prisoner in indefinite segregation sufficient to satisfy
16 objective requirement of Eighth Amendment analysis); Toussaint v. Yockey, 722 F.2d 1490,
17 1493 (9th Cir. 1984) (holding denial of outdoor exercise for over one year to prisoners
18 assigned to administrative segregation raised "substantial constitutional question"). See also
19 Thomas v. Ponder, 611 F.3d 1144, 1151 (9th Cir. 2010) ("We have held consistently that
20 ordinarily the lack of outside exercise for extended periods is a sufficiently serious
21 deprivation for Eighth Amendment purposes.") (internal quotation and citation omitted).

22 This Court therefore finds the state of the law requiring prisoners not be deprived of
23 some access to outdoor exercise for extended periods was sufficiently clear to put defendants
24 "on notice" that continuing to deprive plaintiff of such exercise for almost 14 months was
25 unlawful. Saucier, 533 U.S. at 202. Indeed, the Ninth Circuit has already held, "as a matter
26 of law" in this very action, "the serious risk to [plaintiff's] health posed by this extended
27 deprivation of a basic human necessity was 'obvious' to the prison officials." Thomas v.
28 Ponder, 611 F.3d 1144, 1146 (9th Cir. 2010).

9

2.     Reasonable Belief that Conduct Was Lawful

Even if the violated right is clearly established, qualified immunity shields an officer from suit when he "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 205-06. If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." Saucier, 533 U.S. at 205.

Thus, if the law is determined to be clearly established, the next question is whether, "in light of those principles, a reasonable officer in [the defendant's] position could have believed his actions were lawful." Act Up!/Portland v. Bagley, 988 F.2d 868, 872 (9th Cir. 1993). The defendant "bears the burden of establishing that his actions were reasonable." Maraziti v. First Interstate Bank of California, 953 F.2d 520, 523 (9th Cir. 1992).

Whether a reasonable official could have believed the action taken was lawful is a mixed question of law and fact: "It involves an objective test of whether a reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took." Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995). "If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." Id. If the essential facts are undisputed, or no reasonable juror could find otherwise, however, "then the question is appropriately one for the court." Id. at 1100 (citing Hunter v. Bryant, 502 U.S. 224, 227-28 (1991)).

Here, defendants support their actions on two grounds: (1) the level of violence in Facility C; and (2) plaintiff's mental health record, criminal record, and prison disciplinary history. The Court addresses each in turn.

First, defendants assert, prison violence was a problem in Facility C during the period at issue. (Ponder Decl. ¶¶ 8-12, 33, 50-56.) Specifically, defendants report Facility C had almost 130 "incidents" in 2005 and that the number of "incidents" rose to almost 170 in 2006. (Id. ¶ 50.) Defendants essentially argue the pledge program was reasonable because it

10

1 was aimed to "change the inmates' mindset about prison violence, give them an opportunity
2 to accept responsibility for their actions, and encourage them to rehabilitate and program
3 positively." (Mot. Summ. J. III at 21.) Defendants fail to establish, however, that the level
4 of "incidents" they confronted constituted "unusually high levels" of violence or a "genuine
5 emergency." See Norwood v. Vance, 591 F.3d 1062, 1069 (9th Cir. 2010) ("When violence
6 rises to unusually high levels, prison officials can reasonably believe it is lawful to
7 temporarily restrict outdoor exercise to help bring the violence under control."); Hoptowit v.
8 Ray, 682 F.2d 1237, 1259 (9th Cir. 1982) (noting, "when a genuine emergency exists, prison
9 officials may be more restrictive than they otherwise may be, and certain services may be
10 suspended temporarily"), abrogated in part on other grounds by Sandin v. Conner, 515 U.S.
11 472 (1995).

12 Indeed defendants admit violence in Facility C had prompted "constant program
13 modifications" for "a few years before the July 14, 2005 [assault]," undermining any
14 argument that violence had reached unusual levels. (Mot. Summ. J. III at 8). Defendants
15 also admit "Facility C is the most dangerous general-population unit at [SVSP]." (Ponder
16 Decl. ¶ 28.) Defendants refer to the documented "incidents" as "instances of violence and
17 threats." (Ponder Decl. ¶ 75.) As noted by the Ninth Circuit, however, "[d]ocumented
18 threats and assaults happen frequently in prisons," and "[g]iven that an emergency is
19 different from normal prison conduct, an emergency cannot be deemed to exist simply
20 because there are documented threats and assaults from time to time -- otherwise every
21 prison would be in a constant state of emergency." Thomas, 611 F.3d at 1154. The record
22 shows the lockdown precipitated by the assault lasted less than two months, from July 14,
23 2005 to September 9, 2005. (Ponder Decl. ¶¶ 53-54.) Thereafter, Facility C transitioned to a
24 modified program, to which inmates were subject until they signed the CDC-128-B pledge.
25 (Id. ¶¶ 54, 57, 65-66.) The investigation of the assault had been completed by October 2005.
26 (Id. ¶ 56.) No further lockdowns occurred in Facility C during the time plaintiff was
27 deprived of outdoor exercise. (Evan Decl. Supp. Mot. Summ. J. III ("Evans Decl") Ex. 1.)
28 In sum, there is a material issue of fact as to whether there was anything unusual about the

11

violence levels in Facility C such that it was reasonable for defendants to deprive plaintiff of exercise for a period of almost 14 months. See also Thomas, 611 F.3d at 1155-56 ("Under the circumstances present here, however, in which the punishment of deprivation of exercise appears clearly not to have been necessary to maintain order in the prison, it is difficult to conceive of how a deprivation of a basic human necessity may be deemed reasonable.") (internal quotation and citation omitted).

Next, regarding the information defendants possessed concerning plaintiff himself, defendants rely on the following factors to show plaintiff posed a security risk: (1) plaintiff's 1997 commitment offense and criminal record; (2) plaintiff's psychiatric diagnoses; (3) plaintiff's participation in a 1990 prison riot; (4) plaintiff's anger and hostility toward prison staff; and (5) plaintiff's disregard for prison rules. (See Mot. Summ. J. III at 4-5.) Again, however, defendants fail to show plaintiff's personal history was unusual, such that he presented a significantly higher threat as compared with other Facility C inmates who were allowed outdoor exercise. Defendants themselves admit Facility C housed "the most dangerous general-population unit at [SVSP]," that many of the inmates were there due to convictions for serious offenses and long prison sentences, and that "Facility C inmates are the most difficult to supervise, keep safe, and rehabilitate." (Ponder Decl. ¶¶ 27-29.)

The Court has reviewed plaintiff's disciplinary record, which was provided by defendants. (See Counsel Decl. Supp. Mot. Summ. J. III ("Counsel Decl.") Ex. 2.) While plaintiff's central file contains numerous rules violations reports, there are only two infractions involving physical assault. The first took place in June 1990, more than 15 years before the July 2005 assault on the Facility C correctional officers, and involved a physical altercation among 16 inmates, including plaintiff. (Id. Ex. 2 at MSJ-QI 824-25.) The second occurred in April 2003 and involved plaintiff's striking another inmate on the face. (Id. Ex. 2 at MSJ-QI 850.) Given the generally high levels of violence in Facility C described by defendants, it appears plaintiff may have a comparatively minor disciplinary history. Finally, the fact that plaintiff needed only to sign the pledge form to resume exercise undermines defendants' representations that they considered him a security risk. In sum,

12

there is a material issue of fact as to whether plaintiff posed an unusually high safety concern such that it was reasonable for defendants to believe it was lawful for them to deny him outdoor exercise for a period of almost 14 months.

The cases on which defendants rely, Norwood v. Vance, 591 F.3d 1062 (9th Cir. 2010) and Noble v. Adams, 636 F.3d 525 (9th Cir. 2011), are distinguishable.[5]

The prisoner-plaintiff in Norwood was incarcerated at a California state prison during an unusually violent period in that prison's history. Norwood, 591 F.3d at 1065. Because of prison violence, Norwood endured "four separate extended lockdowns over the course of two years," id., with a denial of exercise in non-consecutive increments of three, three, four and a half, and two months. Id. at 1065-66. The defendants therein presented evidence that the four lockdowns were implemented as the result of "a series of inmate-on-inmate attacks, including a homicide" as well as "serious inmate assaults on staff," culminating in an attempted murder of an officer. Id.[6] After "the fourth major assault on staff in a 19-month period, officers locked down all inmates and declared a state of emergency." Id. The defendants therein also presented evidence that when the prison "incrementally unlocked and released [prisoners] to the small yards for exercise . . . violence continued to happen." Id. at 1069. The Ninth Circuit described the situation confronted by the defendants in Norwood, as "extraordinary violence gripping the prison [and] threaten[ing] staff and inmates alike." Id. at 1068. The court found the prison officials were entitled to qualified immunity, holding, "[w]hen violence rises to unusually high levels, prison officials can reasonably believe it is

---

[5] The Court also notes that Norwood and Noble were decided several years after the events at issue in this case. Consequently, defendants cannot have relied on those cases in choosing their course of action.

[6] The attacks included the following: (1) an attack by eleven Hispanic inmates on four correctional officers, nearly killing one of them, in early 2002; (2) the stabbing of a correctional officer by a black inmate in May 2002; (3) the attempted murder of a correctional officer by black inmates and a separate attack on staff members by black gang-affiliated inmates in late 2002; (4) the attempted murder of an officer by a black gang-affiliated inmate in September 2003. Norwood, 591 F.3d at 1065. Assaults continued even during the lockdowns, including: a battery and attempted battery on officers during the second lockdown, four batteries or attempted batteries of officers during the third lockdown, and five batteries or attempted murders of inmates during the third lockdown. Id.

13

lawful to temporarily restrict outdoor exercise to help bring the violence under control." Id. at 1069.

In Noble, a violent armed riot against staff, described by a prison official as "the most violent and savage attack he had observed in 20 years," occurred on January 9, 2002. Noble, 646 F.3d at 1140. The Ninth Circuit described the situation as follows:

> The riot in the exercise yard, which was started by a Crips gang member, included an attempt by prisoners to kill one of the correction officers and resulted in injuries to 21 staff. Nine staff members were taken to the hospital for evaluation and treatment. The mass assault on staff was an unprecedented event. It was unusual because of the normally antagonistic gangs acting together. The Facility Captain said that this attack on staff was a "life changing event." According to Noble, "Numerous inmate manufactured weapons were found [after the January 2002] riot on the Fac. 'C' exercise yard." . . . This violent riot occurred only one day after a previous prison-wide lockdown had been lifted, a lockdown caused by intermittent prisoner riots during 2001. Those riots, which involved Hispanic groups, created tension between prison staff and African-American inmates because the latter felt they were being arbitrarily punished for the acts of other groups. As recognized by the district court, "African-American inmates at SATF were dissatisfied with the way they were treated and became openly defiant of authority by being deliberately slow to obey orders or submit to searches."

Noble, 646 F.3d at 1140.

Following the riot, the warden declared a state of emergency and imposed a lockdown on the entire prison. Id. The lockdown was released gradually starting with access to contact visits on April 11, 2002. Id. at 1140, 1146. Finally, on August 1, 2002, all inmates were given access to a modified program for outdoor exercise. Id. at 1141, 1146. Consequently, Noble and other inmates were deprived of outdoor exercise for seven months. Following a detailed review of the undisputed facts, the Ninth Circuit held the defendants were entitled to qualified immunity, finding "[t]he record refutes the contentions that the lockdown was in excess of what was required to restore order, was unrelated to the officials' security and safety responsibilities, and was kept in effect for a longer period than necessary." Id. at 1144-48.

Here, on the record presented, defendants have not shown they were confronted with situations equivalent to those described by the Ninth Circuit in Norwood and Noble. First, the prison officials in those cases were able to present undisputed facts showing the violence

14

levels they confronted were "unusually high," justifying the measures taken in response. As discussed above, defendants here have provided the Court with no basis for such a comparison. Further, based on the record presently before the Court, the conditions pertaining in Norwood and Noble were substantially more violent than the conditions existing here.

Moreover, the plaintiffs in Norwood and Noble were deprived of exercise as part of a prison-wide lockdown affecting all inmates. Norwood and Noble were able to resume outdoor exercise once those lockdowns ended. Here, in contrast, the SVSP Facility C lockdown ended in early September 2005, more than 11 months before plaintiff was allowed to resume outdoor exercise. Moreover, although the pledge program followed on the heels of the lockdown, there is a material issue of fact as to whether the pledge program was instituted to respond to the assault that precipitated the lockdown. By defendants' own admission, the pledge program was intended to address a number of problems in Facility C, including: (1) "an influx" of gang-affiliated inmates from Pelican Bay State Prison and Corcoran State Prison; (2) repeated instances of violence between inmates affiliated with the Fresno Bulldogs gang and other inmates; (3) SVSP's "dangerously low" staffing levels; and (4) overcrowding at SVSP. (Ponder Decl. ¶¶ 34-35, 38-45, 47, 49.) Also, as described by defendant Ponder, the pledge program was "consistent with the CDCR's renewed emphasis on rehabilitation and evidence-based programming." (Id. ¶ 55.) While the Court does not question the prison's need to find solutions to serious problems, there exists a factual dispute as to whether the restriction on exercise mandated by the pledge program was necessary to address the type of state of emergency contemplated by Norwood and Noble.

Finally, the periods during which exercise was curtailed were significantly shorter in Norwood and Noble. Indeed, the Norwood court specifically noted, "[w]hen violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise." Norwood, 591 F.3d at 1069 (emphasis added). The almost 14 month deprivation of exercise faced by plaintiff here was twice as long as Noble's and lasted more than three times longer than the longest single period during which Norwood's exercise

15

was restricted. In short, the restriction was not temporary. See also Thomas, 611 F.3d at 1155 (finding "13 month and 25 day confinement without out-of-cell exercise was not []'temporary'"; noting, "[w]hether a deprivation is temporary depends on the expiration date, if any, of the prison's policy, not on whether an individual can escape its application by one means or another.")

The Court also notes that the Ninth Circuit, in its July 2010 opinion, found material factual issues existed as to whether defendants' actions were reasonable, in light of "the serious risk to Thomas's mental and physical health; the level of documented assaults and threats at the facility during the last 11 months Thomas was deprived of exercise; Thomas's limited disciplinary record; his execution of other forms provided by the prison in which he promised to 'program nonviolently'; and the prison authorities' failure to consider providing him with alternative opportunities to exercise." Thomas, 611 F.3d at 1153.[7] This Court, after reviewing the papers submitted in support of and in opposition to the instant motion for summary judgment, finds the material issues of fact identified in the Ninth Circuit's opinion remain, and that they preclude summary judgment on the grounds currently raised.

Accordingly, defendants' motion for summary judgment on grounds of qualified immunity will be denied.

C. Injunctive Relief

Plaintiff seeks both injunctive relief and money damages. (See AC at 1, 5.) Defendants argue the Court should dismiss plaintiff's claims for injunctive relief as moot, because plaintiff no longer is housed at SVSP, the prison at which the events giving rise to the instant action took place. (Mot. Summ. J. III at 25.) The Court agrees.

When an inmate has been transferred to another prison and there is no reasonable expectation nor demonstrated probability that he again will be subjected to the conditions as to which he seeks injunctive relief, the claim for injunctive relief should be dismissed as

---

[7] Indeed, the Ninth Circuit stated: "Given the record before us, and the seriousness of the risk to which [plaintiff] was subjected, it is difficult to conceive how the prison officials['] actions would be deemed 'reasonable.' Nevertheless, the issue is one of fact that must be presented to a fact-finder." Thomas, 611 F.3d at 1152.

16

moot. See Dilley v. Gunn, 64 F.3d 1365, 1368-69 (9th Cir. 1995). A claim that the inmate might be re-transferred to the prison where the injury occurred is too speculative to overcome mootness. Id.

Here, at the time plaintiff filed his Amended Complaint, he was incarcerated at SVSP; he asserted claims alleging unconstitutional conditions pertaining during the period of his confinement at SVSP in 2005 and 2006, and sought injunctive relief to remedy injuries resulting therefrom. On March 11, 2009, plaintiff informed the Court he had been transferred to Centinela State Prison. Because plaintiff has not been incarcerated at SVSP since at least March 2009, to the extent he seeks injunctive relief from the conditions of his confinement at SVSP, those claims will be dismissed as moot.[8]

D. Appealability

If the district court denies qualified immunity on a summary judgment motion, the order is immediately appealable as a collateral order if the judgment is made as a matter of law and "the issue appealed concerns whether the facts demonstrated a violation of clearly established law." Rodis v. City and County of San Francisco, 558 F.3d 964, 968 (9th Cir. 2009) (citation omitted). If the district court denies summary judgment on qualified immunity because there remain genuine issues of material fact, then there is no right of interlocutory appeal, because such an order is not a "final, immediately appealable order." Maropulos v. County of Los Angeles, 560 F.3d 974, 975 (9th Cir. 2009).

As discussed above, this Court finds there are genuine issues of material fact precluding summary judgment on qualified immunity grounds. Accordingly, the ruling herein is not immediately appealable, and the case should proceed to trial. As set forth in the Conclusion section of this order, plaintiff will be referred to the Federal Pro Bono Project for the purpose of locating trial counsel.

---

[8] Should plaintiff seek to allege that some or all of his claims extend to the conditions of his confinement at Centinela State Prison, those claims must be brought in a separate lawsuit in the United States District Court for the Southern District of California, the proper venue for claims arising in Imperial County, where Centinela is located. See 28 U.S.C. § 1391(b); 28 U.S.C. § 84(d).

**CONCLUSION**

For the foregoing reasons, the Court orders as follows:

1. Defendants' motion for summary judgment on grounds of qualified immunity are hereby DENIED.

2. Plaintiff's claims for injunctive relief are hereby DISMISSED as moot.

3. Plaintiff is hereby REFERRED to the Federal Pro Bono Project for the purpose of locating counsel.

4. The Clerk shall forward to the Federal Pro Bono Project: (a) a copy of this order, (b) a copy of the docket sheet, (c) a copy of the Amended Complaint, (d) a copy of the Court's December 11, 2006 order of service, and (e) a copy of the Ninth Circuit's July 16, 2010 opinion in this case.

5. Upon an attorney being located to represent plaintiff, that attorney will be appointed as counsel for plaintiff in this matter until further order of the Court.

6. All proceedings in this action are stayed until an attorney is appointed to represent plaintiff. Once such attorney is appointed, the Court will schedule a case management conference.

This order terminates Docket No. 98.

IT IS SO ORDERED.

DATED: January 12, 2012

_____
MAXINE M. CHESNEY
United States District Judge